IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

MANUEL CAMACHO                                                                PETITIONER

V.                                        No.  12-5069

WENDY KELLEY, Director
Arkansas Department of Correction                                      RESPONDENT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Before the undersigned for report and recommendation is the petitioner's Habeas Corpus

Petitions (Doc. 1) filed April 13, 2012 under 28 U.S.C. Section 2254.

### I.  Background

On May 6, 2006 the Petitioner was arrested in connection with the shooting death of an

individual in Benton County Arkansas.  He was charged with being an accomplice to Capital

Murder and the State sought the death penalty.  On July 11, 2008, after jury selection had begun,

Petitioner pled guilty in Benton County Circuit Court to capital murder, and was sentenced to life

imprisonment without the possibility of parole and a Judgment and Commitment Order was

entered (Doc. 8-2) on July 22, 2008.

On October 9, 2008, pursuant to Arkansas Rule of Criminal Procedure 37, Petitioner filed

a pro se petition for post-conviction relief in the Circuit Court of Benton County. (Doc. 8-4). The

Circuit Court denied the Rule 37 Petition (Doc. 8-4, pgs. 24- 26) without a hearing, and the

Arkansas Supreme Court affirmed the denial on May 26, 2011. The Arkansas Supreme Court

issued its mandate on June 14, 2011. *See Camacho v. State*, CR 09-389, 2011 WL 2062328 (Ark.

-1-

2011).

The Petitioner filed his Petition for Writ of Habeas Corpus under 28 U.S.C. §2254 (Doc. 1) on April 13, 2012 claiming that he received ineffective assistance of counsel. (Id., p. 21). According to the Report and Recommendation issued September 25, 2014 (Doc. 25) the Petitioner alleged the following grounds for relief:

**1. His guilty plea was coerced;**

2. His trial counsel was ineffective by:

      **a. failing to provide an interpreter at each court proceeding and during discussions with him,**

      b. failing to ensure that mental-health evaluations were completed prior to the entry of a guilty plea to determine competency to stand trial,

      **c. inducing him to enter a guilty plea,**

      **d. failing to conduct an adequate pre-trial investigation**, and

      **e. failing to move to dismiss the charges on speedy-trial grounds**;

3. He was actually and constructively denied counsel due to a delay in consular notification; and

4. The State engaged in prosecutorial misconduct by failing to disclose to the defense until jury selection had begun the fact that a gun had been located in a bag in the victim's car. (Doc. 1, pgs. 21-67).

On September 25, 2013 the court entered a Report and Recommendation (Doc. 25) finding the petition to be time barred.  An Order Adopting Report and Recommendation (Doc.

27) was entered November 6, 2013.  The Petitioner appealed the District court's decision and the

Eighth Circuit reversed the District Court on January 21, 2015 (Doc. 34-1).  The Mandate (Doc.

34) was issued March 10, 2015 and the case was reopened and referred to the

undersigned on March 17, 2015.

The court issued an order on March 19, 2015 Appointing Counsel and setting the case for

an Evidentiary Hearing. (Doc. 35).  The hearing was stayed on June 1, 2015 (Doc. 44) pending an

appeal to the U.S. Supreme Court which was denied on October 7, 2015. (Doc. 48).

On March 9, 2016 the court entered an Order on the Respondent's Motion to Clarify and

Limit the Scope of the Evidentiary Hearing (Doc. 62) which granted the motion in part and

denied in part.  As a result of the court's order the Evidentiary Hearing was limited to

determining the "mental capabilities of the Petitioner to enter a knowing and voluntary plea" (Id.,

p. 7) and whether his counsel was ineffective for "failing to ensure that mental-health evaluations

were completed prior to the entry of a guilty plea to determine competency to stand trial." (Id., p.

13).

An Evidentiary Hearing was conducted on November 8, 2016 and at the hearing Dr.

Pablo Stewart, M.D., Circuit Judge Tom Keith, Tim Buckley, and Kent McLemore testified.

## II.  Summary of Relevant Testimony

**A.  Dr. Pablo Stewart, M.D.**

Dr. Stewart, an eminently qualified psychiatrist from San Francisco, California

(Petitioner's Exhibit 1) testified that he was contacted in January 2008 to do an evaluation of the

Petitioner.  At some point it became clear that he would need neuropsychological testing to be

performed and he recommended Antonio Puente, Ph. D. Mr. Puente was retained but he did not

complete his testing until June 9, 2008. (Doc. 76-1). As noted above Dr. Stewart's report was not completed until July 3, 2008.

Dr. Stewart went on to state in his report that, in his opinion, the Petitioner "suffers from multiple psychiatric deficits and mental impairments" including "Posttraumatic Stress Disorder (PTSD) and Polysubstance Dependence." (Id., pp. 20-21). Dr. Stewart further stated that the Petitioner's type of frontal lobe impairment "is strongly associated with PTSD and contributes to his difficulties in acting 'Knowingly' and 'Purposely' with respect to his conduct". (Id., p. 23).

Dr. Stewart testified that he was hired in January 2008 (R. 11:02) to perform a forensic mental health evaluation but was not able to see the Petitioner until March 2008. (R. 14:05). Based on that evaluation he felt that the Petitioner need a neuropsychological evaluation to assess his cognitive function and referred him to Dr. Puente. (R. 14:36). He did this based on his clinical evaluation coupled with the "psycho-social history that came from Ms. Chavez." he felt there were serious question about Petitioner's cognitive functioning and that was why he wanted a bi-lingual/bi-cultural evaluation. (R. 15:59). He testified that his initial impression of PTSD was confirmed by the testing done by Dr. Puente (R. 22:02) and that the Petitioner had a significant impairment in his cognitive function (R. 22:16).

Dr. Stewart acknowledged that his report did not specifically address the Petitioner's competency to proceed to trial or his competency to enter a guilty plea (R. 27:56) but he did have the opinion that the Petitioner was not competent to proceed to trial in July 2008 (R. 28:55). He never communicated his concern to the Petitioner's attorneys but he was never asked (R. 29:42). He only had two very brief conversations with the Petitioner's attorneys and none after the report was filed. (R. 30:26). Even after a review of the change of plea transcript he did not feel

Petitioner was competent to enter a plea. (R. 33:44).  It also would be a significant question as to whether the Petitioner was mentally retarded at the time of plea. (R. 36:30).  He would have needed more information to render an opinion on mental retardation but the issue was never discussed with the attorneys. (R. 38:20).

On Rebuttal Dr. Stewart testified that the reason his report contained so much social history was because that history supported his diagnosis of PTSD. (R. 4:46:41).   PTSD is a serious condition that has very profound effect on a person's brain. (R. 4:48:12).  His report laid out his finding and he would expect the attorney to talk with him to see if any legal theories fit within his findings.  (R. 4:49:43).  On this case, after he submitted his report,  he thought he would be asked by the Petitioners attorneys how his findings would fit into any legal theories, but he never was. (R. 4:50:35).  If I had been asked to perform some criminal responsibility assessment he would have done that. (R.  4:50:57). He felt that his report clearly laid out that, at the time of the crime, the Petitioner was suffering from a "significant psychiatric disease or defect" and Mr. McLemore never called to discuss this with me. (R. 4:51:41).  The question of fitness to proceed was never posed to Dr. Stewart. (R. 4:52:53).

**B.  Circuit Judge Tom Keith**

Judge Tom Keith, the trial judge, testified that he always felt the Petitioner was competent because of his observations and interactions with the Petitioner over the two years of the case. (R. 1:59:10).  Judge Keith testified that it was his practice to try to get a preliminary mental competency review at the Ozark Guidance Center early on(R. 2:00:04), but, in this case, Mr. Buckley convince him that it was not necessary but that he would advise the court if, at any time, he felt it was necessary. (R. 2:00:59). He testified that he never observed anything that

called into question the Petitioner's fitness to proceed (R. 2:02:05, R. 2:05:46) and if he had

observed anything he would have immediately ordered an evaluation (R. 2:06:22).   He also felt

that the Petitioner's responses at the time of the plea were an indication of the fact that he was

competent. (R. 2:07:12).

He trusted the defense counsel's judgment that if the Petitioner's mental health became

an issue they would bring it to his attention. (R. 2:14:45).  If either attorney had raised the issue

that the Petitioner was suffering a mental disease or defect at the time of the offense, or his

competency to proceed or enter a plea, he would have suspended trial proceedings until he had

been evaluated because under Arkansas Law he would not have a choice (R. 2:15:13-40)  but

neither attorney raised those issues (R. 2:15:49).  Judge Keith testified that he did not recall

seeing Dr. Stewart's report (R. 2:21:02) nor did he recall discussing the substance of the report

with the Petitioner's attorneys (R. 2:28:41). If he had read the report he testified that "it would

probably have effected my decision in regard  to proceeding to trial."  He went on to state that

because of his personal observation he still might have accepted his plea "but if there was an

issue of – if the death penalty had still be on the table I would have definitely ordered him

evaluated." (R. 2:22:29).

## C.  Mr. Tim Buckley

Mr. Buckley testified at the evidentiary hearing that he was responsibly for the

guilt/innocence phase of the trial (R. 2:31:40) and the State was seeking the death penalty up

until the end. (R. 2:31:57).  He meet with the Petitioner 25-26 times over the period of two years

and had about 50 hours of face to face time with him.  (R. 2:32).  The first time he met with the

Petitioner he took an interpreter with him to the jail but quickly determined that no interpreter

was necessary because "he spoke English well." (R. 2:34:23). The Petitioner understood the information and the State's theory on the charge and the criminal process. He asked lots of questions and would send letters (R. 2:36). The Petitioner would repeatedly ask about a plea. (R. 2:38). About a month to month and a half before the trial had a meeting in jail and a plea was discussed but he still could not get an offer from the prosecutor but thought that the closer the trial got the more likely a plea offer would be made. (R. 2:39). He discussed the various potential pleas of life without parole, or a straight life sentence on a Murder One charge. (R. 2:40). In Buckley's opinion he understood the plea process and what pleading to the charge meant. (R: 2:40:35). His defense was he did not know the shooting was going to happen until it did. (R. 2:41). He explained that was not what his co-defendants said. You cannot raise mental disease or defect unless you admit some culpability but I had no reason to believe Petitioner had a mental disease or defect. (R. 2:42:51-59). He did not consider any other defenses other than a general denial. (R. 2:45:08). We never considered having Petitioner sent to the State Hospital because we have never gotten anything from the State Hospital that was favorable to the defense. (R. 2:47:29). He was never concerned about his competency and his ability to understand what was going on and I was not going to submit him to a state hospital evaluation unless there was a real good reason to do so. (R. 2:47:50). If he had been worried about his competency he would have moved to have him evaluated for that purpose. (R. 2:48:09). You would not do a cautionary evaluation because that would not be all the state hospital would look at. (R. 2:48:46). Unless you have "genuine concerns yourself about their ability to understand what is going on and ability to assist then you don't do it." (R. 2:49:13). "If you get somebody else, a private psychiatrist or psychologist to look at your client and they raise the issue, that's another story."

(R. 2:49:25).  We never had the idea that competency was an issue and we never wanted him to be evaluated at the state hospital. (R. 2:49:35).  I told Judge Keith in fighting the state's request to have him evaluated that we would not be raising mental disease or any question about his mental health in the guilty/innocence phase of the trial. (R. 2:49:58).  He never had concerns about the Petitioner being able to assist in his defense. (R. 2:52:05).

**D.  Mr. Kent McLemore**

Mr. McLemore testified he had Petitioner evaluated by three separate doctors. The first was Dr. Fatack who concluded that the Petitioner had a full scale IQ of 91 (R. 3:56:55) and, while there might be some psychological issues, none rose to a mental disease or defect that arose to an affirmative defense.[1] Dr. Fatack.  McLemore testified that Dr. Fatack expressed some concern about the validity of his test results because of a language issue so he then contacted Dr. Stewart. (R. 3:57:57).  Dr. Stewart prepared a lengthy report with a lot of social history that we felt would be beneficial in our mitigation case but "I didn't see conclusions raised by Dr. Stewart that would meet the threshold of a psychiatric affirmative defense wherein we would argue that our client could not appreciate the criminality of his conduct." R. 3:59:27. Mr. McLemore stated that he had ten separate contacts with Dr. Stewart (R. 4:01:46) and acknowledged that he received the report in July.

Mr. McLemore also testified that he met with the Petitioner eighteen or nineteen times and the Petitioner was concerned about his case, he asked appropriate questions, and  he was frustrated about not receiving an offer.  R. 4:08:15.  He had no concerns about his competency and never did (R. 4:09:24) and none of the experts ever expressed concerns about his ability to

---

[1]Dr. Fatack's report was never made part of the record.

understand the proceedings (R. 4:09:41). He assisted in his defense, reviewed discover, and told

us what happened in the vehicle at the time of the shooting and after. (R. 4:10:25).  The

Petitioner always denied that he knew that David was going to shoot anyone. (R. 4:11:11).  Mr.

McLemore testified that they received an offer of a term of years during jury selection and the

offer was discussed with the Petitioner, the Ms. Chavez, the mitigation specialist, the Petitioner's

mother and his wife and the offer was accepted.  However, the court rejected the offer and jury

selection resumed. (R. 4:12:30).  Eventually received an offer of Life which the Petitioner

accepted. (R. 4:13:15).  The reason he accepted this is because his co-defendant, Roxanna

Hernandez, was going to testify implicating him in the homicide. (R. 4:14:00).  She was going to

say that the Petitioner told her to get the gun out of the glove box and hand it to Sandoval-Vega.

(R.4:15:52).   We also felt the jury was will to hand down the death sentence.  We were all

concerned he was going to receive the death sentence at trial. (R. 4:14:19). He felt that the

evidence was such that the Petitioner was going to be convicted at trial and he communicated his

concerns to the Petitioner.  (R.  4:16:45). At the time of his plea he had no indication that the

Petitioner did not know what was going on. (R. 4:14:30).

At the time Mr. McLemore was appointed he had never been lead counsel and was not

lead counsel in Petitioner's case. (R. 4:18:58).  If he had a concern about competency he would

raise that "before you get to any stage of the trial" and you do not go forward if the client is not

competent. (R. 4:20:16).  He asked Dr. Stewart to perform a "general psychological evaluation."

(R. 4:20:30).  Judge Keith did not order an evaluation in August 2007 but authorized the hiring

of the doctor. (R.  4:22:12).  He denied that Judge Keith order mitigation evaluations. (R.

4:24:13).  It was our goal to avoid a State Hospital evaluation unless we raised a defense of

mental disease or defect. (R. 4:24:57). He read Dr. Stewart's report and discussed it with Mr. Buckley. (R. 4:26:01). He initially testified that he discussed the report with Dr. Stewart but after referring to his file he acknowledged that he had no note in his file that he discussed the report with Dr. Stewart. (R. 4:26:17). He acknowledged that he read the report and Dr. Stewart's conclusions but he did not recall speaking to Dr. Stewart about his conclusions. He felt the report "spoke for itself." (R. 4:28:06). He did not speak to Dr. Stewart about whether the Petitioner was competent to enter a guilty plea. (R. 4:28:29). He had no concern about the Petitioner's competence (R. 4:28:50) and, he testified that he had three psychiatric experts evaluate the Petitioner and none expressed any concern about his competence. (R. 4:29:19). He did not think to show Judge Keith Dr. Stewart's report when he rejected a term of years because he believed it would not have made any difference. (R. 4:29:55).

There was a worry that if the Petitioner was sent to the State Hospital he might make some statement that would incriminate him because his disclosures would not be protected. R. 4:33:58. Judge Keith entered an order in June 2008 for the Petitioner to sent to the State Hospital and we were "perfectly content to enter a plea before that order was complied with" because we were concerned that, if the order was complied with, "material would have been generated at the State Hospital that would have damaged our client's case." (R. 4:36:03). He felt no obligation to disclose Dr. Stewart's report to Judge Keith. (R. 4:36:41).

McLemore felt that the State Hospital "was not a friend of the criminal defendant" and he wanted top avoid exposing his client to the State Hospital. (R. 4:40:05). We did not believe showing the report to the Judge or Prosecutor would help the Petitioner because Dr. Stewart's report was "essentially a social history narrative that threw in a little psychiatric terminology".

(R. 4:41:41). It was not something they wanted to show the prosecutor unless they had to and had not shown it to the prosecutor. (R. 4:41:56).

### III.  Discussion

**A.  Ineffective Assistance of Counsel**

The Sixth Amendment of the Constitution of the United States affords a criminal defendant with the right to assistance of counsel. *U.S. Const. amend. VI.* The Supreme Court "has recognized that 'the right to counsel is the right to effective assistance of counsel.' " *Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (citing *McMann v. Richardson*, 397 U.S. 759, 771, n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)).

A defendant "faces a heavy burden" to establish ineffective assistance of counsel pursuant to § 2255. *DeRoo v. United States*, 223 F.3d 919, 925 (8th Cir. 2000);  2254. *Cox v. Wyrick,* 642 F.2d 222, 226 (C.A.Mo., 1981) To establish a claim of ineffective assistance of counsel, the Defendant must satisfy the two-part test set forth in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

First, under the "deficient performance" component, he must show that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed [him] by the Sixth Amendment." *Strickland*, 466 U.S. at 687. That showing can be made by demonstrating that counsel's performance "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 522, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)(internal citations omitted).

Second, under the "prejudice" component, he must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. see also, i.e. *United States v  Ledezma-Rodriguez*, 423

F.3d 830, 836 (8th Cir. 2005)(post-conviction relief will not be granted on a claim of ineffective assistance of trial counsel unless the petitioner can show not only that counsel's performance was deficient but also that such deficient performance prejudiced his defense).

To satisfy this "prejudice" prong, Defendant must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different . . . a reasonable probability [meaning] a probability sufficient to undermine confidence in the outcome." *U.S. v. Rice*, 449 F.3d 887 at 897 (internal quotations omitted). Thus, it is not sufficient for a defendant to show that the error had some "conceivable effect" on the result of the proceeding because not every error that influences a proceeding undermines the reliability of the outcome of the proceeding. *Morales v. Ault*, 476 F.3d 545 (8th Cir.2007) (citing *Odem v. Hopkins*, 382 F.3d 846, 851 (8th Cir.2004)). Additionally, actual prejudice does not exist where a petitioner, at best, suffers the mere possibility of prejudice. *See Wainwright v. Torna*, 455 U.S. 586, 587-88 (1982); *Prewitt v. United States*, 83 F.3d 812, 819 (7th Cir.1996) (mere possibility does not equal actual prejudice). Although the two prongs of the "ineffective assistance" analysis are described as sequential, courts "do not . . . need to address the performance prong if petitioner does not affirmatively prove prejudice." *Boysiewick v. Schriro*, 179 F.3d 616, 620 (8th Cir.1999).

Also, to the extent that Petitioner's claims arise out the plea process, he must show a reasonable probability that, but for counsel's errors, he would not have pled guilty and would have insisted on going to trial. See *Strickland*, 466 U.S. at 688; *United States v. Prior*, 107 F.3d 654, 661 (8th Cir. 1997).

**1. Failure to determine competency:**

The Petitioner contends that he received ineffective assistance of counsel "by virtue of counsel's failure to ensure that his client's mental health issues were fully developed and that the mental health evaluations were completed prior to counsel permitting his client to enter into a plea of guilty to the charge of capital murder." (Doc. 1, p. 48).

 "It is well established that the Due Process Clause of the Fourteenth Amendment prohibits the criminal prosecution of a defendant who is not competent to stand trial." See *Reynolds v. Norris*, 86 F.3d 796, 799, 800 (8th Cir. 1996) citing *Medina v. California*, 505 U.S. 437, 439, 112 S.Ct. 2572, 2574, 120 L.Ed.2d 353 (1992).  The Arkansas Statutes provide that "No person who lacks the capacity to understand a proceeding against him or her or to assist effectively in his or her own defense as a result of mental disease or defect shall be tried, convicted, or sentenced for the commission of an offense so long as the incapacity endures." Ark. Code Ann. § 5-2-302 (West).

In order to be competent to stand trial one must have "the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense." *Drope v. United States*, 420 U.S. at 171, 95 S.Ct. at 903. A defendant is competent to stand trial if "he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding-and [if] he has a rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960).

### a.  Judge Keith's Order for Evaluation on August 7.

On August 7, 2007 Circuit Judge Tom Keith held a hearing and the following exchange

occurred:

> Court: Since the last time we had a hearing and bearing in mind the nature of this case and the fact that it is a death penalty case , the Court is sue sponte directing that a – that a mental evaluation of Mr. Camacho be done.

> Mr. Buckley: Your Honor, could I address that for just a second.  (T. 1324).

Mr. Buckley argued that he had represented a lot of capital defendant and that he was against a mental exam at this point.  He ask the court to consider counsels' experience in these matters and "defer to us".  (T. 1325).  The State expressed the same concerns as the court and pointed out that the co-defendant was having an evaluation done.  The following exchange occurred:

> Mr. Buckley: Your Honor, we've –we've talked about that, Kent and I, about having our own evaluation done for purposes of mitigation case in the sentencing phase of the trial, so it's not like we've overlooked that issue and we–we'd be agreeable to that.
> Court: Well, would it – would you be offended if I direct you to do that?
> Mr. Buckley: Would I be offended? No, Your Honor, I wouldn't
> Court: All right, you're so ordered.
> Mr. Buckley: Thank you, Judge.
> Mr. Marczuk:[2] So you've withdrawn your order, right, Judge?
> Court: I'm withdrawing mine, yes.  And basically based on – I'm not – I'm not – I'm not binding you to anything here in regard to your defense to the charge, but I am – what I am directing you to do is to  – to – to obtain a mental health evaluation for purposes of mitigation at this point.
> Mr. Buckley: We're on top of that, Judge, and we will get it done.
> Court: Now, that may very well lead you to the conclusion that, perhaps, you need to take it a step further.
> Mr. Buckley: Yes, sir.  (T. 1326-1327)

---

[2]Mr. Marczuk was the attorney for co-defendant Sandoval-Vega.

To safeguard this due process guarantee, the Supreme Court has established a separate procedural due process right to a competency hearing. *Drope,* 420 U.S. at 172, 95 S.Ct. at 904; *Griffin v. Lockhart,* 935 F.2d 926, 929 (8th Cir.1991). Due process requires the trial court to hold a competency hearing, either on motion or sua sponte, whenever evidence raises a "sufficient doubt" about the accused's mental competency to stand trial. *Branscomb v. Norris*, 47 F.3d 258, 261 (8th Cir.) (citing Griffin, 935 F.2d at 929), cert. denied, --- U.S. ----, 115 S.Ct. 2260, 132 L.Ed.2d 266 (1995); *United States v. Day*, 949 F.2d 973, 981 (8th Cir.1991). Any time evidence appears which raises a sufficient doubt about the accused's mental competency, the trial court must order a competency hearing. *See Speedy v. Wyrick*, 702 F.2d 723, 727 (8th Cir.1983). As the Supreme Court noted in Drope, "[e]ven when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial." 420 U.S. at 181, 95 S.Ct. at 908. *Reynolds v. Norris*, 86 F.3d 796, 800 (8th Cir. 1996)

Judge Keith testified that he did not see anything in the Petitioner's behavior that required him to order an evaluation but that it was merely his practice to get an initial competency evaluation at the Ozark Guidance and Counseling Center. He maintained that he had numerous opportunities to observe the Petitioner and that he believed he was always competent. Based upon his observations and the arguments of Petitioner's attorney he rescinded the order for an evaluation and instructed the Petitioner's attorney's to seek an evaluation for mitigation.

Both Mr. Buckley and Mr. McLemore testified that they met with Petitioner numerous times over a two year period. He never exhibited any signs of irrational behavior, asked appropriate questions, communicated with they verbally and in writing, and understood the

charge and the legal proceedings. Up until the time of plea the Petitioner persisted in his claim of innocence and contended he did not know his co-defendant was going to fire the gun.

It is clear that Judge Keith's Order of August 7, 2007 had nothing to do with a belief by the trial judge that the Petitioner was not competent to proceed, and, it is likewise very clear that neither of Petitioner's attorneys held any belief that he was not competent to proceed.

### b.  Judge Keith's Order for Evaluation on June 6, 2008.

On June 6, 2008 the Petitioner's attorney's made a request for a continuance based on the fact that they had not received the psychological reports yet from Dr. Puente and that Dr. Stewart was waiting on Dr. Puente's report to complete his own. (T. 1629; T. 593).  The State responded as follows:

> As far as these doctors and their issues, number one, it's really the State's problem that we don't have a report, but we're willing to accommodate then in – in the delay in this report.  The Court has indicated that it's willing to have these defendant evaluated at the state hospital while we're waiting on these other reports and, frankly, Your Honor, a state hospital evaluation, case law make clear, would suffice if there's no serious issues that arise.  (T.1631).

The State, later in the hearing, stated that he had emailed a draft copy of the order for evaluation to the attorneys. (T. 1642). There is nothing else on the record about the proposed order but it was signed by Judge Keith on June 6, 2008. (T. 598-99).  On that same day (June 6, 2008) Judge Keith entered an Order for a Mental Health Evaluation of the Petitioner. (T. 598). The Order has a broad scope and orders the Arkansas State Hospital to diagnose the Petitioners mental condition and his "intelligence quotient, to determine his capacity to understand the proceedings against him and to assist effectively in his own defense, and to the determine the extent, if any, to which the capacity of the Defendant to appreciate the criminality of his conduct

or to conform his conduct to the requirements of law was impaired at the time of the conduct alleged." (Id.).

On June 11, 2008 the Arkansas State Hospital acknowledged receipt of the Order and requested the "prosecutor's case files." (T. 605). The Prosecutor represented to the Court on June 25, 2008 that the ASH was going to do the evaluation on June 28 (Monday), 2008 (T. 1664-1665), however, on June 23, 2008 the Arkansas State Hospital sent a letter to the Prosecutor requesting an extension. (T. 607). It is doubtful that the PA had received that letter when he made those representations to the court. It also does not appear that any evaluation by the ASH ever occurred.

On June 25, 2008 Mr. Buckley, in his attempt to stop the evaluation by the ASH, stated that "We will not be presenting psychiatric evidence at least in the guilt phase of the trial; so, therefore, I think it precludes the State from getting Mr. Camacho evaluate presentencing. It's a – violation of his 5th Amendment right. We have not raised the issue of mental disease or defect, we don't intend to." (T. 1686). Mr. Buckley went on to state that they may call Dr. Stewart in the penalty phase (T. 1689) and the court overruled Mr. Buckley's objection to the ASH evaluation. (T. 1690) but provided that no statement made by the Petitioner would be used by the State in the case in chief. (T. 1691). At this time, however, Mr. Buckley had not actually received the report from Dr. Stewart which was not finished until July 3, 2008.

Based on Judge Keith's testimony and the record in the case it is clear that Judge Keith did not order the mental evaluation because of any concern that he had for the competency of the Petitioner but merely as a prophylactic measure in case the Petitioner's evaluation was not received prior to trial.

Both Mr. McLemore and Mr. Buckley testified that they wanted to avoid any examination by the Arkansas State Hospital because, at the time, their client was still contending that he did not know his co-defendant was going to fire the weapon, and that anything that was said or disclosed during the examination would be disclosed to the Prosecution. Both attorneys repeatedly testified that there experience had been that nothing good for the defense ever came from a state hospital evaluation. The also both testified that there own experts had evaluated the Petitioner and had not rendered any basis for a defense, based upon their own observations their client was competent, and it was a strategic choice not to have him evaluated. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *U.S. v. Rice*, 449 F.3d 887 at 897 (*quoting Strickland*, 466 U.S. at 690, 104 S.Ct. 2052). See also *Francis v. Miller*, 557 F.3d 894 (8th Cir. 2009) (trial strategy decision, if reasonable at the time, cannot support ineffective assistance claim even if, in hindsight, better choices could have been made).

### c.  Dr. Stewart's Report

The Arkansas Supreme Court, in addressing the issue of the Petitioner's competency to proceed found that "Despite appellant's apparent contention that his competency to stand trial or to enter his plea was placed in issue, it was not." The court went on to state that "Although appellant may have had a mental-health examination, that fact alone, particularly in light of the particular circumstances presented here, was not sufficient to demonstrate that he was not competent. That his attorneys elected not to raise a challenge to appellant's competency after receiving a report from retained professionals on the issue weighs heavily against any demonstration of incompetency." *Camacho v. State*, 2011 Ark. 235, 3 (2011).

This case centers around the report issued by Dr. Pablo Stewart on July 3, 2008 (Petitioner's Exhibit 2, Doc. 59-2) and whether the Petitioner's attorneys provided ineffective assistance, in light of Dr. Stewart's report, in failing to attempt to stay the proceeding in order to determine competency.

Dr. Stewart's report provides in part as follows:

"Manuel displayed significant neurocognitive impairment of frontal lobe functioning. The frontal lobes of the brain are involved in "executive functioning." The so-called executive functioning of the frontal lobes involve the ability to recognize future consequences resulting from current actions, to choose between good and bad actions (or better and best), override and suppress unacceptable social responses, and determine similarities and differences between things or events. He scored 97 on the Category test, a measure of the efficient functioning of the frontal lobes. This score places Manuel in the less than 1% of the population range. That is 99% of the population achieve scores greater than Manuel's." (Petitioner's Exhibit No. 2, p. 18).

In Intelligence testing, Manuel scored somewhere between the upper borderline intellectual functioning range and the very low normal range. In particular, he achieved an IQ of 70 in the C_TONI test. This test is very similar to the Category test mentioned above in that it is a measure of fluid intelligence and problem solving ability. Again, Manuel scored in the less than 1% of the population range." (Id., p. 19).

Dr. Stewart testified at the Evidentiary Hearing that he did not believe the Petitioner was competent to proceed to trial or to plea but he admitted that he did not perform any test for competency and that his report does not render any opinion on competency. His report did have the diagnosis of posttraumatic stress disorder but he likewise did not render an opinion on whether that condition constituted a disease or defect he lacked the capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

As noted above, both attorneys had significant contact with the Petitioner over a two year

-19-

time period and never had any indication that he was not competent to proceed or that they had

any basis for a defense of mental disease or defect. Mr. McLemore testified that they had three

reports from experts and none provided that the Petitioner was either not competent to proceed or

that he had a defense based on mental disease or defect.

The Arkansas Supreme Court has stated that "A criminal defendant is presumed to be

competent,  however, and the burden of proving incompetence is on the accused." *Haynes v.

State*, 346 Ark. 388, 58 S.W.3d 336 (2001). To be competent to stand trial, a defendant must

have "the capacity to understand the nature and object of the proceedings against him, to consult

with counsel, and to assist in preparing his defense." *Drope v. Missouri*, 420 U.S. 162, 171, 95

S.Ct. 896, 43 L.Ed.2d 103 (1975). This capacity has been described as "a modest aim"  *Godinez

v. Moran*, 509 U.S. 389, 402, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993). The Arkansas Supreme

Court  has defined the test of competency to stand trial as "whether a defendant has sufficient

present ability **to consult with his lawyer with a reasonable degree of rational understanding

and whether he has a rational, as well as factual, understanding of the proceedings against

him**." *Thessing v. State*, 365 Ark. at 390, 230 S.W.3d at 532 (quoting *Haynes v. State*, 346 Ark.

388, 392, 58 S.W.3d 336, 339 (2001)); *Deason v. State*, 263 Ark. 56, 562 S.W.2d 79 (1978)

(citing *Dusky v. United States*, 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)). This is,

essentially, a two-part test, with incompetency to stand trial being established if either part is

demonstrated. *United States v. Cunningham*, 556 F.Supp.2d 968 (S.D.Iowa 2008).

It is recognized that not every manifestation of mental illness demonstrates incompetence

to stand trial. *United States v. Turner*, 644 F.3d 713 (8th Cir.2011) (citing *Vogt v. United States*,

88 F.3d 587, 590 (8th Cir.1996)). Similarly, neither  low intelligence, mental deficiency, nor

bizarre, volatile, and irrational behavior can be equated with mental incompetence to stand trial. *Lyons v. Luebbers*, 403 F.3d 585 (8th Cir.2005). *Newman v. State*, 2014 Ark. 7, 24--25 (2014). Even though a petitioner can document a history of mental illness or show that counsel could have argued incompetence, that showing, without more, is not sufficient to support postconviction relief. See *Robertson v. State*, 2010 Ark. 300, 6-7, 367 S.W.3d 538, 543 (2010) citing *Henry v. State*, 288 Ark. 592, 708 S.W.2d 88 (1986).

Even if the Petitioner had "neurocognitive deficits" or low intelligence it is clear that the Petitioner had the ability to consult with his lawyer and assist in his defense. According to his attorneys he understood the charges and the possible penalties, understood the amended charge and accomplice liability, had asked rational questions about parole and lesser charges, never exhibited any erratic or irrational behavior, reviewed the evidence, asked reasonable questions, communicated rationally orally and in writing, and maintained his innocence up until the time of plea.

For almost two years after his arrest the State had never made a plea offer in his case and the Petitioner constantly exhibited concern to his attorneys about not receiving an offer. He received an offer for a term of years for the first time during jury selection at the beginning of the trial and the offer was discussed with him. His mother and wife were present during these discussions. At no time did he express any lack of understanding nor did any family member express a concern about his ability to understand and he accepted that offer, however the trial judge was not willing to plea one defendant to a term of years while the other received life without parole. After jury selection resumed the offer of life without parole was made to the Petitioner which he accepted. Both attorneys again testified that they had no doubt that he

understood the offer and the consequences.

Mr. McLemore also testified that the defense did not want to show Dr. Stewart's report to the Prosecution or to the Court. While no one testified to the reason of their reluctance to show the report it is noted that the report refers in detail to the Petitioner's long term gang affiliation. The Prosecution had secured the report of Al Valdez, an expert witness, to render an opinion regarding the gang-related nature of the crime (T. 2832) and the trial court had indicated that he was going to allow the testimony. (T. 1636).

Judge Keith testified that if he had been made aware of Dr. Stewart's report he would have been compelled to halt the trial and wait for the State Hospital Report. He also testified, however, that it still may not have prevented him from accepting his plea because he was convinced the Petitioner was competent in light of his observations and interactions with the Petitioner over two years. An accused's representations during plea-taking, such as those concerning the voluntariness of the plea, carry a strong presumption of veracity. *Nguyen v. United States*, 114 F.3d 699, 703 (8th Cir. 1997). The Petitioner made coherent and logical responses at the time of the plea and made statements of regret to the victims family as well as his own both in English and Spanish. Judge Keith's conclusion concerning the competency of the Petitioner is presumed to be correct. *Demosthenes v. Baal,* 495 U.S. 731, 735, 110 S.Ct. 2223, 109 L.Ed.2d 762 (1990).

Based upon all of the evidence and the circumstances of the case it does not appear that counsel's performance "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 522, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003).

### d.  Failure to demonstrate prejudice

Disregarding the Petitioner's attorney decision to not have the Petitioner tested for competency the Petitioner has failed to demonstrate prejudice. To satisfy this "prejudice" prong, Petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different . . . a reasonable probability [meaning] a probability sufficient to undermine confidence in the outcome." *U.S. v. Rice*, 449 F.3d 887 at 897 (internal quotations omitted).

In light of the fact that neither Dr. Stewart nor Dr. Puente specifically tested for competency there is no evidence that the Petitioner was not competent to proceed and substantial empirical evidence that he was.  Dr. Stewart testified that he did not believe the Petitioner was competent to plea but he admitted that he never conveyed his opinion concerning competency to either of the Petitioner's attorney's and that his written report did not contain an opinion that the Petitioner was not competent to proceed.  It is unknown what Dr. Stewart's opinion would have been if proper competency test had been administered at the time of his examination. The court also is left to speculate on what the results of the ASH report would have been but it is clear that neither attorney felt the ASH examination would be helpful.  There certainly is not a "reasonable probability" that the results of the case would be different.

**2. Failure to provide an interpreter:**

The Petitioner contends that his attorney was ineffective because he failed to require an interpreter at all stages of the proceedings. (Doc. 1, p. 28).

The Arkansas Supreme Court found that "Although appellant contended that he was prejudiced by the absence of an interpreter, the trial court found in conjunction with the suppression hearing that appellant understood English. The record indicates that an interpreter

was present for some hearings, and the recordings of appellant's statements support the court's findings on that point." *Camacho v. State*, 2011 Ark. 235, 6 (2011).

The appointment of an interpreter lies within the sound discretion of the trial judge. 28 U.S.C. § 1827(d); *See United States v. Coronel-Quintana*, 752 F.2d 1284, 1291 (8th Cir. 1985) citing *United States v. Tapia*, 631 F.2d 1207, 1210 (5th Cir.1980). Because the decision to appoint an interpreter will likely hinge upon a variety of factors, including the defendant's understanding of the English language, and the complexity of the proceeding, issues, and testimony, the trial court, being in direct contact with the defendant, should be given wide discretion, *United States v. Carrion*, 488 F.2d 12, 14 (1st Cir.1973), cert. denied, 416 U.S. 907, 94 S.Ct. 1613, 40 L.Ed.2d 112 (1974), and this decision should not be disturbed unless the trial court clearly abuses its discretion. *United States v. Salsedo*, 607 F.2d 318, 320 (9th Cir.1979); *United States v. Sosa*, 379 F.2d 525, 527 (7th Cir.), cert. denied, 389 U.S. 845, 88 S.Ct. 94, 19 L.Ed.2d 111 (1967). The review of the record indicates no such abuse of discretion.

The court has viewed the Petitioner's prior DWI arrest, listened to his interview with the police at the time of his arrest (State's Exhibit 14, 15, 16), and reviewed his plea exchange with the trial court. (State's Exhibit 1, Vol. 12, pp 2328-2347). All of these Exhibits show the Petitioner's proficient command of the English language.

In addition the Petitioner's attorney's testified that they met with him in excess of thirty times and never had difficulty communicating with him.  The trial judge also testified that he had many hearings with the Petitioner and was satisfied that he could understand English sufficiently.

During his initial interview by the police he lied about his identity and denied that any shooting had taken place in his vehicle while he was driving it.  It was only after confrontation

with evidence from other witnesses that he admitted that his co-defendant had discharged the weapon while he was driving the vehicle.

The court also notes that subsequent to the plea, when asked by the court if he had anything to say, the Petitioner (weeping) apologized to the victims family in English. (Disc 1, Vol. 12, T. 2338).  After that apology he then apologized to his family in Spanish and then informed the court in English what he had said to his family in Spanish. (Id., T. 2339).

His contention that he could not effectively communicate with his attorney is without merit.

### 3.  Coerced to enter a plea by his attorney:

The Petitioner asserted his attorney was ineffective because he coerced him into pleading guilty. (Doc. 1, p. 55). The Arkansas Supreme Court found that the Petitioner "alleged that his attorney told him that he had no chance and that he would get the death penalty if he went to trial. He alleged that the jury would have been biased against him, that motions for change of venue and severance had been denied, that information about his record had been made public, that the judge would not accept a plea to a term of years, that voir dire was performed in chambers, and that people involved with the prosecuting agency were related to the victim. None of the allegations in the petition rose to the level of coercion. *See Pierce v. State*, 2009 Ark. 606 (per curiam)."  Camacho v. State, 2011 Ark. 235, 4 (2011).

The U.S. Supreme Court has repeatedly emphasized that the effectiveness of legal representation afforded criminal defendants is to be appraised by normative legal standards which, when applied in a specific factual context, yield a resolution concerning whether a particular defendant received constitutionally adequate assistance of counsel. *Powell v. Alabama*,

287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); *McMann v. Richardson*, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970). In the guilty plea context, a lawyer need not give wholly accurate advice in order to render effective assistance; he need not correctly predict the admissibility of evidence or anticipate future judicial holdings. His advice, however, must be "within the range of competence demanded of attorneys in criminal cases." [FN7] *McMann*, supra, at 770-71, 90 S.Ct. at 1449. *U. S. ex rel. Healey v. Cannon*  553 F.2d 1052, 1057 (C.A.Ill. 1977).

Although "[t]he decision to plead guilty—first, last, and always—rests with the defendant, not his lawyer," this court has nonetheless maintained that "the attorney has a clear obligation to fully inform her client of the available options." *Smith v. United States*, 348 F.3d 545, 552 (6th Cir. 2003). "A failure to provide professional guidance to a defendant regarding his sentence exposure prior to a plea may constitute deficient assistance." *Moss v. United States*, 323 F.3d 445, 474 (6th Cir. 2003) (citing the habeas case of *Magana v. Hofbauer*, 263 F.3d 542, 550 (6th Cir. 2001)). Defense counsel thus carries the "paramount" duty to "ensure that the client's decision [to waive his constitutional right to trial] is as informed as possible." *Miller v. Straub,* 299 F.3d 570, 580 (6th Cir. 2002). "A criminal defendant has a right to expect at least that his attorney will review the charges with him by explaining the elements necessary for the government to secure a conviction, discuss the evidence as it bears on those elements, and explain the sentencing exposure the defendant will face as a consequence of exercising each of the options available." *Smith,* 348 F.3d at 553. *Titlow v. Burt*, 6th Circuit, 2012. On cert to Sup. Ct.

In this instance the government was seeking the death penalty in a capital murder case

and the only possible jury verdict was the death sentence or life without parole.  At his plea the

Petitioner acknowledged that his attorneys had reviewed all the evidence the state had and

explained what the State had to prove in order to find him guilty. (Disc 1, vol. 12, T. 2330).  The

agreed statement of fact recited by the Prosecuting Attorney at the time of plea stated that the

Petitioner was the driver of the vehicle, the owner of the murder weapon, that he positioned the

vehicle to allow his co-defendant to fire into the victims car and encouraged the co-defendant to

shoot. (Id., T. 2335).  Both of Petitioner's attorneys testified that the state's case against the

Petitioner was strong and that there was a strong probability of conviction and a possible death

sentence.

The Arkansas Supreme Court correctly determined that the Petitioner's claim that his

attorney coerced him to plea was without merit.

**4.  His attorney failed to conduct an adequate investigation.** (2d)

The Petitioner's claim that his attorney failed to adequately investigate seems to revolve

around the fact that the a loaded pistol was in the victim's vehicle and was not disclosed to the

defense until jury selection had begun. (Doc. 1, p. 62-62).

The Arkansas Supreme Court stated that "Appellant's allegations about insufficient

investigation do not include any facts that would tend to support an assertion that further

investigation would have changed the result in this case. Appellant was facing the death penalty.

The factual basis at his plea hearing and the statements held admissible in pretrial hearings

indicated that ample evidence was available that appellant positioned the car so that his

codefendant could fire the fatal shot. Under the circumstances, even if, as appellant implied in

the petition, further investigation may have provided evidence of a gun in the victim's car, that

evidence would not have provided a strong defense to the charge." *Camacho v. State*, 2011 Ark. 235, 5 (2011).

Counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Whitmore v. Lockhart*, 8 F.3d 614, 618-19 (8th Cir.1993) (*quoting Strickland*, 466 U.S. at 691). In this case it is plain that the defense was aware of the weapon in the victim's back pack which was located in the back seat because the government announced an intention to file a motion in liminie to preclude the defense from disclosing this evidence to the jury during a break in voir dire selection. (Disc 1, vol. 12, T. 2313). The prosecuting attorney stated to the court that the gun was in the backpack and there was no evidence that it was ever produced during the road confrontation between the Petitioner and the victim. (Id.). After argument by the state and defense the court stated that he would take the motion under advisement but he made reference to a prior case (Bennett) where the Arkansas Supreme Court had "made it plain that – the weapons were not relevant to the shooting [and] should not have been admitted into evidence." (Id., p. 2317, lines 8-12). Later the court stated "So y'all can - y'all can brief it and I will consider your brief, but -but I can tell you that unless at trial there - that - that I - I see a stronger foundation than I see at this point that I'm not likely to admit it." (Id., p. 2318).

It is clear that the Petitioner's attorney was well aware of the victim's gun in his backpack and the state was intent on keeping that evidence away from the jury. The Petitioner's argument that his attorney failed to investigate this fact is without merit.

### 5. Failure to move to dismiss on speedy trial grounds. (2e)

The Petitioner claims that his attorney was ineffective for failing to dismiss the charge on

speedy trial grounds. (Doc. 1, p. 64).

The Arkansas Supreme Court found that "[W]ith this additional excluded period of nineteen days[3], for a total excluded period of 434 days, the time period indicated on the court's docket does not demonstrate a speedy-trial violation. Appellant presented no basis on which counsel might have successfully moved to dismiss for a speedy-trial violation. *Camacho v. State*, 2011 Ark. 235, 7 (2011).

The Petitioner does not make any reference in his Petition that the number of excluded days is incorrect or specifically how the state violated his speedy trial rights. Conclusory allegations that are unsupported by the facts do not provide a basis for either an evidentiary hearing or postconviction relief. *See Hayes v. State*, 280 Ark. 509, 660 S.W.2d 648 (1983); *Greene v. State* 356 Ark. 59, 66-67, 146 S.W.3d 871, 877 (Ark.,2004).

In his Response the Petitioner concedes that this claim is without merit. (Doc. 59, p. 2).

### 6. Failure to Notify the Mexican Consulate:

The Petitioner contends that he was denied counsel because the Mexican Consulate was not promptly notified of his arrest and that he gave incriminating statements without the benefit of advice from the Mexican Consulate. (Doc. 1, p. 57).

The purpose of the Vienna Convention is to ensure that a foreign government can provide assistance to its nationals who have been arrested. See Article 36 of the Vienna Convention on Consular Relations. *United States v. Raven*, 103 F. Supp. 2d 38, 41 (D. Mass. 2000). Even if the Vienna Convention on Consular Relations could be said to create individual rights (as opposed to

---

[3] The court ordered the defendant's examination by the state hospital on June 6, 2008. The order would have tolled the running of the speedy-trial time under Rule 28.3 from that time until at least the date of the hearing on June 25, 2008.Camacho v. State, 2011 Ark. 235, 7 (2011)

setting out the rights and obligations of signatory nations), it certainly does not create constitutional rights. *Murphy v. Netherland*, 116 F.3d 97, 99–100 (4th Cir.1997).  The failure to advise Petitioner of his right under the Vienna Convention is not a jurisdictional defect and was therefore foreclosed by his guilty plea. *See United States v. Guzman-Landeros*, 207 F.3d 1034, 1035 (8th Cir.2000) (per curiam); and *United States v. Flores-Garcia*, 230 F.3d 1364 (8th Cir. 2000).  The Vienna Convention does not expressly or impliedly provide for the remedy of suppression of statements or confessions where an arresting government fails to notify a foreign national of [his] right to contact the Consulate.  *United States v. Tapia-Mendoza*, 41 F.Supp.2d 1250, 1255 (D.Utah 1999). *See also United States v. Chaparro-Alcantara*, 37 F.Supp.2d 1122, 1125-26 (C.D.Ill.1999) ("The Court, however, finds nothing in the Vienna Convention that provides for the exclusionary rule as a remedy for violation of its provisions."). Because suppression of statements is not provided for under the Vienna Convention, it is an inappropriate remedy for any violation asserted. *United States v. Raven*, 103 F. Supp. 2d 38, 41 (D. Mass. 2000).

The Petitioner acknowledges in his Response that this argument has no merit.  (Doc. 59, p. 2).

### 7. **Prosecutorial Misconduct:**

The Petitioner contends that the State engaged in prosecutorial misconduct because during jury selection "the State of Arkansas had just recently disclosed to the defense the fact that a gun had been located in a backpack in the victims' car. (Doc. 1, p. 61).

On July 3, 2006 the Petitioner filed a Motion for Discovery which contained a request for any "exculpatory or favorable material. (Disc 1, vol. 3, p. 36; R. 421-422).  The prosecutor is

guilty of misconduct when he deliberately suppresses evidence that is clearly relevant and favorable to the defense  regardless of whether the evidence relates directly to testimony given in the course of the Government's case.  *U.S. v. Agurs*  427 U.S. 97, 121, 96 S.Ct. 2392, 2406 (U.S.Dist.Col.1976).

As noted above the State file an oral motion in liminie to prohibit the defense from utilizing this evidence during the jury section.  It is clear that the defense was aware of the evidence and that the State sought to preclude the defense from using it but it is unclear when the defense was made aware of this evidence.  The court did not rule on the State's Motion in Liminie but seemed to indicate that the court did not think the evidence was relevant.

While the issue was raised in the Petitioner's Rule 37.1 Petition the Arkansas Supreme Court did not rule on the merits because it determined that alleged prosecutor misconduct was not appropriate to consider in the Rule 37.1 petition.

The court had agreed to take testimony on this issue at the Evidentiary Hearing, however, prior to the hearing the Petitioner acknowledged that there was no Prosecutorial Misconduct and filed a Motion to Withdraw that claim (Doc. 83) on October 13, 2016.  The Motion states that "When the undersigned counsel finally obtained discovery, the photos of the gun and police reports given to trial counsel revealed that counsel was aware of the loaded gun in the victim's vehicle prior to counsel for the State of Arkansas' revelation on the third day of jury selection. Therefore, trial counsel had photo evidence of a loaded gun in the victim's vehicle on the day of arrest".  (Id., p. 7).

## B.  Certificate of Appealability

A certificate of appealability may issue only if the applicant has made a substantial

showing of the denial of a constitutional right.   28 U.S.C.A. § 2253 One factor to consider on

whether to issue a COA is if the procedural default is not clear and the substantive constitutional

claims are debatable among jurists of reason, the certificate should be granted. *Slack*, 529 U.S. at

484–85, 120 S.Ct. 1595.

The court believes that the issue of whether the Petitioner's attorneys were ineffective for

failing to determine their client's competency to enter a plea in light of Dr. Stewart's report is an

issue that is debatable among jurist of reason and that a COA is justified on that issue.

## IV.  Conclusion

Based upon the forgoing I recommend that the instant motion, filed under 28 U.S.C.

§2254 be dismissed with prejudice.

**The parties have fourteen days from receipt of this report and recommendation in**

**which to file written objections pursuant to 28 U.S.C. Section 636(b)(1).  The failure to file**

**timely written objections may result in waiver of the right to appeal questions of fact.  The**

**parties are reminded that objections must be both timely and specific to trigger de novo**

**review by the district court.**

*/s/ J. Marschewski*
HON. JAMES R. MARSCHEWSKI
U. S. MAGISTRATE JUDGE

-32-